Okay, you may proceed Mr. Hipwell. Judge Jolly and the rest of the panel, Ian Hipwell, court appointed on behalf of Richard Buswell and with me is Andre Belanger, we're both CJA appointed for this case and only because it was the last thing addressed, I believe, by our former colleagues regarding the amount of the 5K1. To put that in context, the government recommended 15% for Mr. Richard Buswell and the court gave 5%. And so the court fully understands how that occurred. Same procedure, separate seal procedure, the judge said I'm granting the government's 5K1, not telling us what the amount was. We had our sentencing procedure and when you read the transcript, what Judge Foote said, it was the very, very last thing she said when she was given the actual sentencing thing before she turned to matters of you'll self-surrender, not self-surrender, but the business that you have to do after your sentence, that is reporting to probation. She says your sentence is 103 months and that is a 5% reduction. We were floored. That was the last thing we heard. Richard Buswell, we believe, should be resentenced with at least the government's 15% reduction from the low end of the sentencing guideline range. In his case, that would be at 87 to 108 months of criminal history category 3, that would be a term of 74 months. And even from the high end judge, if it were the most stingy one that were given on a remand, a 15% reduction would be to 92 months instead of the 103 that she gave him. Now, I know that our arguments are not joined on the previous case, but we do adopt the good arguments of Mr. Sadow and Mr. Stewart-Mones on behalf of their clients. But I think probably the best way to explain, and this was done in testimony and I believe in even the motions that were filed by other counsel, the flawed premise of the 1 to 167 parts of THC to marijuana. The testimony in that hearing was that you would wind up with industrial hemp, which has no euphoric value at all. The actual THC concentration, there was testimony of this, you will remember, in contemporary marijuana is about 14.5%. That was put forth in that hearing. Accordingly, as much as we would like and adopt also the 1 to 1 ratio that esteemed counsel suggests, even their experts suggested an alternative argument, an alternative ratio, and that was 1 to 7. And that 1 to 7, when you do the math, is based upon 14.5% THC in contemporary marijuana. And remember, Judge Foote agreed, Your Honors, no scientific or logical basis for the 1 to 167 ratio in the math. We searched for this, spent hours looking for this, and I cannot remember his name, but there is an expert for the United States Sentencing Commission who comes around and teaches. He taught in September here in New Orleans as well. Whatever that gentleman is, I asked him at a hearing, rather not a hearing, but at a conference in Lafayette with Western District criminal justice appointed attorneys, and he said he had researched it, and there is nothing, nothing that sustains it. I believe Mr. Domain says that it was based on careful scientific data at the time. If that's the case, it's all lost. There is nothing of that. So, Judge Foote says, or rather Judge Foote said, no logical reason for it, and so we have to ask ourselves then, is there any useful advice from this ratio? And we know, of course, that the Supreme Court said in Rita, you look to see if the commission had relied on empirical evidence, and you look to see if there's review and revision in light of judicial decisions, and of course there's no help there. AM 2201, of course, came along long after that Apple guideline was promulgated. Judge Foote said Congress approved it, but of course it really is a default position. Congress just said nothing, and so then the sentencing commission has also said nothing about that, and they have said things about some other drugs, including methamphetamine and cocaine. We submit that her, both what she said and what Ms. Domain quoted beforehand, and then actually in the hearing, she erroneously believed that she was bound by the guidelines. I'm just the district judge. AM 2202, did you say to the government's argument here that she properly did, she properly calculated the sentence under the guidelines, and that the error was the fact that she did not reduce the sentence after she calculated it, if she felt like a departure was required? I think I'll answer that in two, in twofold. First of all, as Ms. Domain has argued, you have to compute the guidelines. Now that is true, but if you have to compute the guidelines, that allows us to fall into this ethereal belief that the guidelines are the guidelines, and therefore they have power and they have rationality. I think that hearing proved there was no rational basis for the 1 to 167 ratio, and so she, we believe, believed she could not depart once she had said that, because she said this issue may be one for a higher court. And her position— Would you say that she had the power to override the guidelines as a matter of the law, just to say, this is error, and I'm not going to follow it, or would she exercise her discretion and say, I disagree? I mean, I know that's cutting it kind of thin, but— I think she could do either one, Your Honor, but I do believe that she thought she had no authority to do it. Despite what counsel says about citing Kimbrough, she too often said, I'm just a district judge, and the issue is one for a higher authority. Mr. Domain talked about Burns, and Burns states that a defendant is entitled to have his sentence set by a judge aware of the discretion in Kimbrough. We do not believe she was aware of that great discretion she had, and we believe this hearing proved that if you didn't have the 1 to 1 ratio, you at least had scientific proof at that hearing of a 1 to 7 ratio, based upon what I've just said. Now, also— I mean, is there any authority—let me just think about this—is there any authority in Kimbrough, or otherwise, that gives the district judge the authority to disregard the guidelines? I think so. I don't think there's not, because you always have to make the calculation based on the guideline, and then exercise your discretion. I'll give you that, Judge Jolly. Yes, you have to compute them, but in that judicial temperament then, and what you do— In other words, I'm saying she could not take all of this evidence that you've got and say, okay, I'm going to revise the guidelines. She couldn't say that, could she? Other judges around the country have said, we disagree with the guidelines, and so we're going to adopt a more rational ratio. There is one in Iowa, or Indiana—I forget his name right now, and he had done that with several different substances. Most anything, even in the judiciary. Well, Judge, I'm sorry I did not maybe hear what you said, but I think when you join what this Court said in Burns with what the Sixth Circuit said in Camper that Mr. Sadow said, district courts are not free to cede their discretion by concluding that their courtrooms are the wrong forum for setting a new ratio. District judges must not rely on the guidelines for reasons that Kimbo rejected, and those reasons are institutional competence, deference to Congress, or the risk that other judges will set a different ratio. Since she found no basis, Your Honor, judges, for such a basis to exist, she should have determined a more rational one, or adopted marijuana as the closest analogous drug. Even in Millers, that Ms. Domain talked about, the guidelines remain the guidelines, and this Court said that in two places. Even there, this Circuit said, we do not blindly approve a within-guidelines sentence, even though it carries a rebuttable presumption of reasonableness. So the mantra of the guidelines remain the guidelines, Your Honor, should not sustain a sentence based upon a ratio that all parties agree is arbitrary. Judge, I want to move to the safety valve disparity, and quoting Ms. Domain from a few moments ago, dangerousness of AM-2201, AM-2201 is a dangerous drug, people die, psychosis. What is the safety valve we're talking about now? Well, the leadership role of everyone above Richard Buswell, and the documented serious bodily injury to users of synthetic marijuana, should have denied these four co-defendants Malone, Green, Barrow, and Espinoza the ability to earn the safety valve. They all got safety valve. Your Honor, it is in Guideline Section 2D1.117 and 5C1.2, it allowed a two-level reduction in the guideline for being a first-time offender, having a good criminal history. There are five factors, Judge Raleigh, there are five factors that must be met. We submit the record shows those people above Mr. Buswell failed. It's lack of criminality, and also there's no dangerousness involved, Your Honor. No one in this case was safety valve eligible. Richard Buswell, we submit, needs to be resentenced with a downward variance of two levels to cure what essentially was an unwarranted disparate sentence, which did occur. Judge Foote claims to have considered proportional responsibility for each defendant, and you said his sentence is incorrect because the other judge's sentence was incorrect, not necessarily because your client's sentence is incorrect standing alone, but it's incorrect because you compare it to other persons. Yes, and our client was not safety valve eligible because of his criminal history and because of these other factors too, but no one, no one was so eligible. She said, this is one of the reasons she granted our objection to the leadership enhancement. You may know from reviewing this case that for a year, we were the only person faced with a leadership role. It was an absurdity. You heard this testimony about 1400 kilograms of the drug. In our case, our local distributed, he's held responsible for 10.4. It's 135 times more by the defendants just before us. In her sentence in colloquy, this is very important, Judge Jolly. She said that she found Richard Buswell's conduct similar to that of Boyd Barrow. She believed that Richard Buswell would have, quote, come out the same place in the guidelines except for his criminal history and the fact that he was not safety valve eligible. That's powerful. With a variance, if you reduce him from offense level 20 ... I'm having trouble to say. Why doesn't that make sense? I mean, what am I missing? Why doesn't that make sense? Why doesn't it make sense? She awarded safety valve to these four people ahead of time and we ... It doesn't make sense from your guy. He was not entitled to them. No, but from a comparative sentence ... I mean, if you get this sentence up, his stays the same. He's happy and therefore he wins. No, he wants two levels down because everyone else got two levels and she very, very rationally in her own mind ... Well, they weren't either and that's our point. Well, it does ... It makes a disparate sentence, Your Honor. It really, really does in the scheme of things. It makes the whole sentencing process ... And you can cure that just on remand by ordering her to go downward two levels like she did for the other four people above him. You have any idea how that would have occurred? In other words, why the judge would have done that or what was it that she misunderstood? Judge Smith, all I can tell you is that from September 5th before the sentencing in December for a couple of months there, she was radared in a hearing that we had about our leadership responsibility and Buzwell being the only one with a leadership business. She was very, very concerned about that. Then as Ms. Domaine said, the government filed its generic 5K1. She wanted more information so they filed, in our case with Mr. Buzwell, another memorandum which said we recommend a 15 level reduction. From that point forward, we responded. We were given one day to respond and six days before sentencing, we pointed out this whole business of what would happen and it's very, very important. Judge, I told her in that particular matter, I told her we are led to believe that a number of defendants might be earning safety valve consideration under the guidelines section. If so, and when factoring the downward departure they may deservedly earn, an even wider disparity issue might be created between whatever sentence is imposed on Mr. Buzwell as opposed to one or more of his suppliers. We submit some of the co-defendants might arguably fail on at least two of the five subsection requirements in Guideline 5C1.2 and those are for if there's any danger or It was an absurdity to say that Richard Buzwell was the only leader in this case. And you know, the government fought leadership. We did not win that leadership reduction literally until the day of sentencing and the government even objected to it at that time. The meager 5% substantial assistance award, this is kind of unique. In Judge Hike's case, the security case ahead of time, he rewarded a 25% reduction for the very same cooperation at issue here, Richard Buzwell's cooperation in Judge Foote's case. We find that astounding and there's just no rhyme or reason for the 5% reduction other than what she says, she said that she thought that he created some problems with the evidence. Well that talks of telephone conversations that he had from the jail, which did cause the government problems. And that's one of the reasons they didn't call him, but he met with them on several times. Mr. Mayne wasn't there. I was. But the government met with him several times, hours on end, in a jail cell, debriefing him about what was happening and how they might use him in rebuttal. A 5% reduction, she had to have considered non-5K1 factors. She had to have considered his character and all. At the end, what she writes in her statement of reasons, and we know the statement of reasons at the end of a case is really for the total judgment. When she talks about considering his character and all in the total sentence, we submit she really did that also when she did the 5K1. And Judge, on that, I see my time is just about out, I yield, and thank you very much. Thank you. Mr. Ballinger? Huh? Oh. Yeah. Are you next? I think you're next. Oh, you're for rebuttal, aren't you? You're rebuttal only? Yes, Your Honor. Oh, I'm sorry. Okay. Thank you. Your Honor, again, Camille Domingue for the United States. Although I would love to talk about trained rats and binding assays for an additional period of time, I don't want to repeat too much or really any of my previous argument from the earlier case. I know that this matter is before the same panel, and I'm sure you will take all of those arguments into account. But I would like to hit on a couple things, and particularly the new pieces that apply to Mr. Buswell only. The first thing I do want to address, maybe a little bit more fully than I did last time, was sort of to justify the district court's statement, again, at the very beginning of the hearing, not in connection with the ultimate ruling, but sort of when the judge is giving the lawyers an idea of where she's going, she says, you know, the guidelines are with . . . I would just say that she erred by . . . in a certain way, you're hoisted on your own cart. That's the argument that she has to set the calculation, the Senate calculation to begin with, is that she thought she had to disregard the conversion rate in order to depart downward. I don't think that . . . In other words, what she said dovetails with that. She says, I cannot set aside these conversion rates. That's on higher court, to set aside the conversion. And she may be . . . or the sentencing commission, and that's certainly correct. But she did have the authority, and maybe she misunderstood, because she made no reference to it, that, okay, I can set the . . . and accept these conversion rates, but at the same time, I am going to depart downward. Judge, I think when she says, I can't disregard the ratios, she means in calculating the guideline range, because, again, we have to calculate the guideline range according to what's in the guidelines. Then, after we calculate it, we can then . . . we, the district court . . . I think that's the import of it, Judge. This is . . . that's my argument, that when she says, the guidelines are what . . . Well, I think it's very much like . . . and this is what I referenced in my argument in the previous case. In Miller, this was the child porn case, where the defendant was basically arguing that the child pornography guidelines aren't the result of empirical study, and they shouldn't . . . the district court shouldn't even consider them. And this court said, no, the guidelines are the guidelines, and it's up to the commission to change them. And as long as the guidelines are the way they are, district courts have to calculate the guidelines according to what's in the book, they have to consider them, and then they have the discretion, but not the obligation to vary. And so . . . That's the second part she didn't apparently understand. Judge, I disagree. I think the district court understood that well. She uses the word, I will decline to do so. And that's specifically in the ruling. And so, you're not inclined to set aside these conversion rates. Well, Judge, I . . . you know, our argument, like you said, we're sticking to it, is something else. I think the court understood it properly. It couldn't set aside the ratios in calculating the range. It could set aside the ratios in deciding whether to deviate. And again, when the judge says the guidelines are what the guidelines are, that's almost a direct quote out of Miller, where this court has said the same thing. The guidelines are the guidelines. And it's up to the sentencing commission to change them. And until it does, we have to calculate them. And then, under Kimbrough, the court has the discretion to vary. And I'm going to decline to do that because I think in this case, you know, this is Congress's effort to evaluate or to determine the relative seriousness of trials. Now, on the question of the extent of the departure, counsel just argued that, you know, all he got was 5 percent. The government recommended 15. Judge Hike gave him 25 in a whole different case. The record on Mr. Buswell in the 5K hearing was fairly clear, that Mr. Buswell was not an ideal witness. The government had represented in its 5K motion, or rather in the detailed memorandum in support of the 5K motion, that Mr. Buswell had created some trouble for the government in the pre-cooperation phase of the case. There were recorded telephone calls with the co-defendant, Mr. Stanford, the lawyer who ultimately went to trial in this case, that were basically intended to try to set up Mr. Stanford's trial defense. And this, of course, was problematic. These are recorded conversations, and Mr. Stanford might have elected to use those. So that was a problem. Because of some of the things that Mr. Buswell had done, the government didn't have a lot of confidence in his veracity. This made him a less valuable witness than some of the other witnesses. And so, you know, the district court had all of this information in front of it. Now, you know, the government was recommending 15. The district court said, well, you know, I'm only going to give you 5. And it's well settled under the law of this circuit that the district court has great discretion in determining the extent of a 5K departure for substantial assistance. And it should consider the government's recommendation, but it's certainly not bound by it. And that's Hashimoto and Johnson and a lot of other cases we cite in our brief. And that's basically what the court did. I think if you look at the transcript of the hearing and the government's memorandum under the district court's part, it all had to do with how useful Mr. Buswell was as a witness. Going to the issue then of the disparity created by granting other co-defendants a safety valve reduction. Judge Jolly, as you pointed out, there's no dispute that Mr. Buswell was not entitled to a safety valve reduction. His criminal history was too extensive. And he doesn't contend otherwise on appeal. He's not challenging the court's ruling on his safety valve reduction. What he's basically saying is that his co-defendants should not have gotten safety valve reductions, and that created a disparity. And our argument is that he basically doesn't have standing to challenge another defendant's sentence. If anybody is going to challenge his own sentence. He does. One that is disparate from the one that his co-conspirators received. Well, but you have to keep in mind that his co-conspirator sentences were affected by a greater 5k departure. Their argument also is that they were entitled to the safety valve, and he wasn't. Correct. That's a disparity, and that's a proper disparity. It is. Our argument is it's a proper disparity. They cooperated more. Their cooperation was more valuable. They didn't create the pretrial problems that Mr. Buswell created. And their criminal histories were less significant. And that was the determining factor in who got the safety valve reduction. They had far less significant criminal history calculations than Mr. Buswell did. So the 3553A doesn't prohibit all disparity, only unwarranted ones. Our argument would be that the disparity in this case was entirely warranted. And the last thing I'll touch on is the consecutive versus concurrent nature of these two sentences. These sentences were imposed on completely different criminal conduct by two different district court judges. Judge Foote imposed the sentence in this case. Judge Richard Hike imposed the sentence in the other case, which was a securities fraud matter. By the defendant's own admission, that securities fraud offense was completed before this drug conduct even started. So there's no temporal overlap. One is securities fraud. The other one is drug trafficking. The only possible connection is this case involved one of the defendants in the drug case was Daniel Stanford, who was a lawyer. Mr. Stanford had originally represented Mr. Buswell on the securities fraud case until he was conflicted out because they were co-defendants in this criminal matter. And so one of the ways that Mr. Stanford was going to explain the flow of drug money, the government's contention it was drug money, was to say, no, those were legal fees from the securities fraud case. I mean, that doesn't make the two matters connected from a relevant conduct sense, not the way we define relevant conduct under 1B1.3. I mean, that was a fortuity. If it wouldn't have been for the existence of the securities case, I'm sure Mr. Stanford would have come up with something else. They would have made up something, or a will, or a personal injury incident, some other criminal case, there would have been something else. That was purely fortuitous. So you have two different sentences imposed by two different judges at different times. The district court obviously had authority under both the guidelines and under the statute to impose them consecutively. There is essentially a presumption that they are consecutive, because the sentences were imposed at different times. That's in the statute 3584. And then sort of the last thing, I guess, would kind of be a fourth prong of plain error, which is how, or really, I guess, the effect on substantial rights. The district court had the authority to depart as far as it wanted. It could have done a greater substantial assistance departure if it wanted to account for any of this. It certainly didn't do that. And at the end of the day, Mr. Buswell gets 25% from Judge Hike for cooperating in the drug case. Then he gets 5% from Judge Foote for cooperating in the drug case. If you add it up, he gets 30% on the total sentence for cooperating in the drug case, which is equal to the greatest departure received by any defendant in this case, including defendants like Mr. Malone and Mr. Greene, who, you know, Mr. Greene testified at trial. Mr. Malone and Mr. Greene cooperated. It sounds like funny math to me, though. Well, it's- All the reductions he's gotten for all the crimes he commits means that all that can be transferred to this one case here. Well, but I think that's what the judge said. I think Judge Hike, in the securities fraud case, and that record is not before the court, that's the representations of counsel, that Judge Hike and the securities fraud case said the 25% reduction in that case was for the drug case, and I'll tell you, it has to be for the drug case, because Mr. Buswell did not receive a 5K in the securities fraud case. There was nobody he could cooperate. He was the lead defendant in the securities fraud case. There was nobody he could have cooperated against in that case. So the reduction he gets in the securities fraud case is for the drug case. And like I said, when you add up 25 and 5, he gets 30, which is a good amount. I want to, if we've pretty well gotten rid of that horse, I want to take you back again one more time, while we're still here together, to tell me why this is not like Simmons, where we said the district court misapprehended its temporal discretion, reading it to deal really with, as limited to this one ratio. And you have suggested that this district court didn't make the same mistake. But her language is this. She said, I might be persuaded to depart under Kimbrough. And she said, because the tables and the sentencing guidelines are what they are. I'm just the district judge. And then she said that, it suggests that, that Kimbrough's not applicable because it was just a comparison, and I'm not quoting now. But then she said, I'm quoting again, of one equivalency to another equivalency. The ratio of converting cocaine to marijuana. While this case is concerned with just one ratio. I mean, it sounds like, on its face, that she's making the same mistake that the district judge did in Simmons' case. Perhaps there's some explanation for that in context. I'm pulling stuff out of context, and I don't recognize that. But help me with that. Judge, I think, you know, the judge basically addresses this at three different points. She addresses it, from what you've just read, that's before any testimony started at the beginning of the hearing. She addresses it in the middle of the hearing, when Mr. Sadow is either cross-examining the government's expert, or examining his own expert. That's when she makes the coin-of-the-realm comment. That we have to convert everything to marijuana because that's the coin of the realm. And then she addresses Kimbrough again in, in her final comments when she's basically denying the request for a downward deviation on Kimbrough grounds. And I think you have to evaluate the court's comments at all three points in context. So I think when the court says, you know, the guidelines are what they are. I think what she's saying is, I, I need to calculate the, the gu, again, basically what this court said in Miller. I, I follow that argument. But to the extent that whatever the time in which she said it, that she suggests that Kimbrough was involved, a comparison of one equivalency to another equivalency. I don't know how that, that's an error when that's, that, the timing doesn't help secure that problem. Well, what, what makes that confusing is the district judge makes this, this blanket statement that the guidelines convert everything to marijuana. And of course, they don't always convert everything to marijuana. Because in a case, you know, where you have only crack or only powder cocaine, there's no conversion to marijuana. So, but I think what the judge was trying to say is, Kimbrough was comparing two drugs. And I know counsel in the first case, Mr. Sadow, takes great exception to the fact that it's two drugs saying, you know, is it one drug or is it two? The guidelines and the statutes treat a lot of versions of the same drug differently. We treat a mixture of meth, of methamphetamine, pure methamphetamine, and ice differently, even though it's all methamphetamine. So I'm not sure that that makes a critical difference. But when the district court says, that's, that's two equivalencies. What she's basically saying is, in Kimbrough, they were comparing, is crack worse than powder? How much worse is crack than powder? Whereas in this case, these ratios, 1 to 167, 1 to 200, 1 to 135, whatever they are. This is a way of converting everything to its marijuana equivalency. And the court ultimately says, you know, everything in the guidelines is arbitrary. And I think by that she means, why a level 38? Why not a level 164? I mean, we, we put numbers on things. But she makes the point more than once, that the guidelines make an, make the effort to evaluate the relative seriousness of the drugs. And at the end of the day, that's what sentencing is all about. We want to sentence people more, you know, to more time if, if they deal with a more serious drug. And so, you know, again, our argument is that the district court well understood that she had the discretion to, to deviate under Kimbrough. She just didn't, she didn't disagree. She thought that this was a fair sentence. She simply didn't just. Why, why, why did the judge say, if anything, in weighing the respective opinions of the experts? On what specific point, your honor? On the, on the fair thing we're talking about. On the proper conversion rate for the contraband addition. Well, she, she, when, when the. On one side's testimony and criticize it, adopt others in, with respect. Oh, absolutely. Absolutely. After all the, the experts have testified, after all the witnesses have testified, when the judge makes the ruling on the equivalency, she says, you know, I'm inclined to go with the THC because of this. Binding assay, functional assay, animal studies. And then she talks about the fact that although the defense expert had criticized the government's expert's testimony by saying they were not human studies, even he had conceded that they are suggestive or predictive. And we always start out testing on drugs by doing animals first. Then, so yeah, she, she does go. Does she effectively then conclude that the 167 conversion ratio was correct? I think she effectively concluded that it was not it was not arbitrary in the sense that it's, that it should be, that it should be, that the guidelines advice should be disregarded. I mean, basically, the judge gave a guideline sentence here. Meaning, she accepted the advice of the guidelines as not being arbitrary or irrational or something that needed to be overridden by the court's discretion. Okay. Thank you, Your Honor. Madam Jury. Good morning, Your Honors. I'd like to start off with some comments that the government made regarding the disparity because of the safety valve. As I appreciate the government's argument a few moments ago, is that they were converging two different concepts. The quality of the 5K departure for the various other defendants to justify the disparity in the safety valve. And these are really two different concepts and two different departures that should not be joined together. As, as the court is probably well aware at this point, there are four manufacturers and exclusive suppliers to Richard Buswell about the Miyagi product and the AM2201 drug. All four of those individuals got the safety valve. And none of them should have gotten the safety valve because one, they were leaders of a drug trafficking organization. And two, as the government indicated today, that there was a dangerousness component to the drugs. So what we have here at a sentencing is that there are five leaders of a drug trafficking organization, none of whom are eligible for the safety valve because of their leadership role and also because of the dangerousness of the drug. But we only give the safety valve consideration to four of those five people. You have to couch your argument, not in terms of those other defendants, but in terms of your own client. We have no standing, as they pointed out, to challenge the sentences of the other two. I agree with that, your honor, but I also agree with the point that you made to the government.  And by giving the safety valve unjustifiably to his four other co-defendants, you have created a disparity amongst the defendants in the same case. You've given them an unjustified benefit, and solely not to our client. So he's entitled to an unjustified benefit. He's entitled to a downward variance to correct the disparity, your honor. That is our argument. Entitled to an unjustified benefit, which you just argued. Only because of the disparity that was created by giving the safety valve to the others. We're not being given the same methodology in our sentence. What I'd like to go to also, if I- There's a certain rationality that you had around the argument you were making. Well, I- The disparity presupposes that they're all on the same plane. And if he's differently situated, there's no disparity. But you're not really- I think Judge Allis suggested your client is differently situated. And you're saying, no, they aren't. You disagree with whether there's any disparity or not. They were entitled to the- I mean, they were eligible for the safety valve, and your client was not eligible. I would argue they were not eligible, your honor, because they were leaders of a- They were eligible. That is, they didn't have any criminal record, for one thing. But we're also having a dangerousness as one of the elements, and the government has taken the position that AM 2201 is a danger. They were also leaders of a drug trafficking organization. Because your client was equally dangerous and as equally as bad as they were. He gets his sentence reduced. But even to the next step, your argument that the sentences are impermissibly disparate are different. It rests on the incorrectness of the other sentences. Yeah. That is, they're incorrect apart from being different. The disparity, they made mistakes in those other cases, and they ought to make the same mistake to you. That's a very different problem than- Well, that is, you know, my argument. There was an error created by awarding that, and then it created the disparate sentence. You litigate their sentences in order to get the premise for your argument. You've got to litigate whether they were, in fact, entitled to the safety valve reduction. So you litigate their sentences, and then you're halfway home. We have raised that issue in our memorandum to the trial court. I only have 30 seconds left, and it's okay. I'd like to talk about the government's continued argument about the guidelines. I do believe that this court misapplied or didn't apply its authority. When you say the guidelines are the guidelines, but then you can't just jump to say, well, the court must have considered whether or not they could vary and didn't do so, when, as it's been quoted up here by this court numerous times, that the judge did not think that she had the power to go outside of them, and that there was no findings or basis for the guidelines. At that point, you can't just say the guidelines are the guidelines. Now, I'll step down with this. By adopting that position, we put ourselves into a situation where we're pre-Booker, and the guidelines become mandatory, and I think that's an error. Thank you. Okay. Thank you, Mr. Belanger.